## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| 335 RIGHTERS FERRY ROAD, LP<br>                    Plaintiff,<br>v.<br><br>MINNO & WASKO ARCHITECTS AND<br>PLANNERS, PC and MOORE CONSULTING<br>ENGINEERS, LLC,<br>                    Defendants;<br><br>And<br><br>MOORE CONSULTING ENGINEERS, LLC,<br><br><br>                    Third-party Plaintiff,<br>v.<br><br>NOLEN PROPERTIES, LLC,<br><br>                    Third-Party Defendant;<br><br>And<br><br>MINNO & WASKO ARCHITECTS AND<br>PLANNERS, PC,<br><br>                    Third-Party Plaintiff,<br><br>v.<br><br>HARKINS BUILDERS, INC.,<br><br>                    Third-party Defendant. | Civil Action No.<br>23-cv-01963 |

## DEFENDANT MINNO & WASKO ARCHITECTS AND
## PLANNERS, P.C.'S THIRD-PARTY COMPLAINT
## AGAINST HARKINS BUILDERS, INC.

Defendant/Third-party Plaintiff, Minno & Wasko Architects and Planners, P.C. ("M&W" and "Third-Party Plaintiff"), by and through its attorneys Thompson Becker, LLC, avers by way of Third-party Complaint against Harkins Builders, Inc. as follows:

6

## THE PARTIES

1.      M&W is an architectural design professional corporation, which maintains a principal place of business located at 80 Lambert Lane, Suite 105, Lambertville, New Jersey 08530.

2.      Harkins Builders, Inc. ("Harkins") is a Maryland formed incorporation which maintains a principal place of business located at 10490 Little Patuxent Pkwy #400, Columbia, MD.

## JURISDICTION AND VENUE

3.      Subject to Third-Party Plaintiff's Answer to First-Party Plaintiff 335 Righters Ferry Road, LLC's Complaint (the "First-Party Action" or the "Complaint"), at paragraph 14, jurisdiction is allegedly proper in front of this Honorable court under diversity jurisdiction with an amount in controversy in excess of $75,000.00.

4.      Venue is proper in this Court because a substantial part of the events, acts or omissions giving rise to the Plaintiff's claims in the First-Party Action occurred within this District and the improvements to real property commonly known as 335 Righters Ferry (the "Building") which is the subject of the Plaintiff's First-Party Action, is situated within this District. *See* 28 U.S. Code § 1391(b)(2).

## FACTS COMMON TO ALL COUNTS

### A.      Parties' General Roles and Involvement

5.      This is a civil action (the "Action") initiated by Plaintiff 335 Righter Ferry Road, LP ("Plaintiff" or "Owner") by way of Complaint dated May 23, 2023 (the Complaint).  [Doc. 1]

6.      The Action arises out of the construction of one five-story rental apartment building with 210 residential units constructed over a two-level parking garage in Bala Cynwyd,

Pennsylvania (the "Project" or the "Building").

7.      The Project is owned by Plaintiff, which was established as a single-purpose entity for purposes of developing the Project and is itself devoid of independent officers and/or employees.

8.      Third-Party Defendant Nolen Properties, LLC is named in this Action.  The parties have agreed to substitute the name of Nolen Properties, LLC with Nolen Development Company ("Nolen").

9.      Third-Party Defendant Nolen was the Owner's representative and/or construction manager on the Project and was the primary and/or sole entity that made decisions with respect to the Project's design and/or construction.  At all times relevant hereto, Nolen acted on its own and as agent to Plaintiff.

10.     The primary representative of Nolen that made decisions on behalf of Nolen and the Owner was Rick Sudall, whose title at the beginning of the Project was managing director and by the end of the Project was managing partner.

11.     For purposes of developing factual bases for Harkins' joinder in this action, Mr. Sudall was deposed on May 29, 2024.  A true and correct copy of relevant portions of Sudall's deposition testimony ("Sudall Tr.") are attached hereto as Exhibit "1."

12.     Defendant/Third-Party Plaintiff M&W provided architectural services for the Project pursuant to a contract with Plaintiff.

13.     Defendant Moore Consulting Engineers, LLC, as a sub-consultant to M&W, provided engineering services with respect to the mechanical, electrical and plumbing ("MEP") components of the Project.

14.     Third-Party Defendant Harkins was the general contractor on the Project pursuant to

a contract with Owner ("Owner/Harkins Contract").  A true and correct copy of Owner/Harkins Contract is attached hereto as Exhibit "2."

**B.    Plaintiff's Complaint and Plaintiff's Allegations Relating to Damages**

15.    In the First-Party Action, the Owner claims damages in excess of $5 million associated with alleged "property damage caused by condensation, the dripping of condensation onto other building components and resulting mold growth" and "other damages" attributable to alleged errors and omissions in the Project's MEP design.  *See* Plaintiff's Complaint, at ¶¶ 31, 37 and 38 [ECF 1]; Updated Joint Report of Rule 26(f) Meeting [ECF 53], at p. 2.

16.    Plaintiff's Complaint expressly alleges (as do documents exchanged in the course of discovery) that Plaintiff has sustained damage to "other property," such that Plaintiff's alleged damages in the First-Party Action do not solely relate to damages to the Building that was the subject of the Owner/Harkins Contract.

17.    The Plaintiff's Complaint alleges that Plaintiff sustained the following damages:

- Paragraph 31: "this condensation dripped onto and withing the Building components and caused property damage within the Building, including but not limited to drywall damage, other building component damage and mold growth.";

- Paragraph 37: "property damage and the additional damages described in the paragraphs below"; and

- Paragraph 38:  damages to: (i) "repair and remediate property damage caused by condensation, the dripping of condensation onto other building components and resulting mold growth;" (ii) "re-design, renovate and/or supplement the HVAC System ...;" (iii) "accommodate tenants;" (iv) lost rental income; and (v) depreciated value and reputational harm.

18.    In the Updated Joint Report of Rule 26(f) Meeting (Doc. No. 53), Plaintiff states that it also seeks damages associated with "temporary mitigation measures."  The parties do not yet know the precise scope and nature of Plaintiff's damages alleged in this Action.

C.    **Owner/Harkins Contract**

19.    In its role as general contractor, Harkins, was in charge of coordination, inspection, and approval of all aspects of construction, including, but not limited to, the construction of the exterior envelope of the Building, installation of roof insulation, sealing of the Building's penetrations/fenestrations, and installation of HVAC equipment and insulation.

20.    Harkins was hired by the Owner as the general contractor on the Project as a replacement to an initial general contractor.

21.    Upon information and belief, the Owner replaced the general contractor with Harkins because the initial general contractor's Guaranteed Maximum Price (GMP) for the Project was deemed by the Owner to be too high and the Owner wanted to construct the Project for a lower price.

22.    The Owner/Harkins Contract defines the "Relationship of the Parties" as follows:

> [Harkins] accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to cooperate with the Architect and exercise the Contractor's skill and judgment in furthering the interests of the Owner, to furnish efficient business administration and supervision, to furnish at all times an adequate supply of workers and materials, and to perform the Work in an expeditious and economical manner consistent with the Owner's interests.

*See* Ex. 2, Owner/Harkins Contract, at Article 3.

23.    As the Project Architect, M&W reasonably and justifiably relied upon the expectation that Harkins would "cooperate with the Architect" and exercise Harkins' skill and judgment in constructing the Project in a workmanlike manner and without defects.

24.    Exhibit "A" to the Harkins Contract, AIA Document A201-2007, General Conditions of the Contract for Construction, as amended, defines "Indemnitees," subject to the indemnification provision in the General Conditions (the "Indemnification Provision"), as:

10

the Owner, Owner's general partner, Lender, Architect and each of their
respective members, partners, officers, directors, employees and agents,
and each of their respective heirs, successors, and assignees.

*See* Ex. 2, Owner/Harkins Contract, Ex. A, General Conditions, at ¶1.1.11.

25.     The Indemnification Provision, at Section 3.18 of the Owner/Harkins Contract
General Conditions, provides that Harkins agrees to indemnify and hold harmless the Indemnitees
(which included M&W and Moore) from, among other claims: "(2) injury to or destruction of
tangible property (other than the Work itself) to the extent caused by the negligent acts or
omissions of Contractor, Subcontractor, anyone directly or indirectly employed by them or anyone
for whose acts they may be liable."   *See* Ex. 2, Owner/Harkins Contract, Ex. A, General
Conditions, at ¶3.18.

26.     As the Project Architect, M&W expected that Harkins would indemnify M&W
consistent with provisions of the Owner/Harkins Contract.

27.     The Owner/Harkins Contract was a Guaranteed Maximum Price ("GMP") contract
of $49.7 million (the "GMP Amount").  *See* Ex. 1, Sudall Tr. at p. 12:11-14.

28.     The Owner/Harkins Contract was structured such that any savings to total
construction costs below the GMP amount would inure to the benefit of Harkins.  *See id.*, at p.
13:3-12.

29.     Hence, Harkins had an economic incentive to minimize construction costs as much
as possible to reduce cost of the Project so it could retain any savings.  *See id.*, at p. 13:13-17.

30.     The GMP amount was based on a budget prepared by Harkins, which included an
allowance for the scope of work associated with heating, ventilation, and air conditioning
("HVAC") of the Building.

31.    Harkins (with input from its potential subcontractors) set the allowance amount and/or budget for HVAC scope of work.  *See id.*, at pp. 67:9-68:10; 25:5-7; 55:3-16; 56:5-15.

32.    Harkins developed and set the HVAC allowance in the Owner/Harkins Contract with the intention of both Harkins and Owner (through Nolen) would value engineer the HVAC scope of work.  *See id.*, at pp. 23:9-12; 24:3-10.

33.    Harkins value engineered ("VE'd") the HVAC design "in order to value engineer some contingency . . . back into the [Harkins/Owner] contract," meaning the HVAC scope of work would cost less than the contingency to leave contingency ("cushion") that would not exceed the HVAC contract/budget allowance.  *See* Ex. 1, Sudall Tr., at pp. 74:14-21; 75:1-21.

34.    The Owner relied upon Harkins to set the amount of the HVAC allowance in the Owners/Harkins Contract and budget.  *See id.*, at pp. 67:23-68:10.

35.    At the time that the budget that was incorporated into the Owner/Harkins Contract was developed by Harkins, the estimate costs for HVAC work was $300,000 over the allowance amount and to reduce the HVAC costs to below the allowance amount, Harkins had to significantly reduce costs by value engineering.  *See id.*, at pp. 96:6-97:10.

36.    Neither Moore nor M&W were involved in discussions between Harkins and Nolen (as the Owner's representative) regarding, and were not asked by Plaintiff or Nolen to review, analyze and/or provide feedback about, the amount of the HVAC allowance set forth in the Owner/Harkins Contract; rather, that allowance dollar amount was agreed just between Harkins and Nolen Team.  *See id.*, at pp. 23:12-23; 51:2-12.

D.    **Harkins' Involvement With Value Engineering of the Project**

12

37.     Value engineering ("VE," "VE'd" and/or "VEing") is defined, according to Nolen's representative Rick Sudall, as: "trying to basically save money on the design of the [P]roject, make alternative-develop alternate design that come[s] up with some cost savings for the [P]roject." *See id.*, at p. 23:13-19.

38.     Throughout the Project, Harkins made numerous representations, promises, assurances and/or recommendations to Nolen and the Owner, which contradicted, reversed, overruled and/or bypassed the Moore and M&W.

39.     Harkins dictated to the Owner (and the design team) how Harkins wanted to construct the Project.

40.     Harkins, in its role as general contractor, together with the Owner and/or Nolen participated in extensive meetings and correspondences relating to VEing certain elements of the Project to reduce the GMP construction budget and incorporate into the GMP budget a "contingency" allowance.

41.     Nolen and Harkins were very aggressive in making numerous unilateral VE decisions throughout the Project for the reducing the construction budget.

42.      In an email dated November 23, 2016, between Harkins' representatives (Drummond, Young and Kraemer) and Nolen representative Kovacisk (not M&W or Moore), Harkins proposed that the "Owner will contractually commit to having design team to [sic] target VE to make up the initial shortfall of $1,450,000 which will become Contractor's Risk Contingency."   A true and correct copy of the November 23, 2016 Harkins Email to Nolen is attached hereto as Exhibit "3."

43.     Project meeting minutes (prepared by Harkins) demonstrates how Harkins and Nolen (without input or feedback from M&W and Moore) unilaterally made decisions about VEing

the HVAC design during the early stages of the Project's contract-negotiation process and throughout the course of construction.

44.    In a pre-construction meeting solely between Harkins and Nolen on November 29, 2016, Harkins and Nolen continued on-going discussions (without including M&W and Moore) regarding VEing HVAC design on the Project, stating: "We have identified this an important area to VE contingency back into the [P]roject."  A true and correct copy of the November 29, 2016 Pre-Construction Meeting Minute, at Note 9, is attached hereto as Exhibit "4."

45.    In that meeting minute, Harkins described its efforts to engage its subcontractors to develop VE ideas with respect to the Project's HVAC design.  *See id.*, at Note 9.

46.    During the negotiation of the Owner/Harkins Contract, without the benefit of Moore and M&W being present, Harkins and the Owner discussed Harkins' numerous suggestions about HVAC system's design.  *See* Ex. 1, Sudall Tr., at pp. 57:21-58:2; 59:8-60:5; 72:5-15.

47.    A January 5, 2017 Owner & Architect Progress Meeting Minute Number 1 (which related to a meeting solely between Harkins and Nolen, not M&W nor Moore) states that Nolen and Harkins discussed "HVAC Design" — stating: "The HVAC Design needs to have a subcontractors' input.  The budget was discounted to reflect potential VE savings."  A true and correct copy of January 5, 2017 Owner & Architect Progress Meeting Minute Number 1 is attached hereto as Exhibit "5."[1]

48.    Upon information and belief, Harkins' budget, which was incorporated into the Owner/Harkins Contract, included an unreasonable, arbitrary and/or unrealistic reduced dollar amount set by Harkins for HVAC work before Harkins and Moore had determined how to VE the HVAC design and the cost and feasibility of the HVAC work.

---

[1] Sudall explained that the date in the January 5, 2017 Meeting Minute (which states the year as 2016) is likely a typographical error and the referenced meeting occurred in the year 2017.  *See* Ex. 1, Sudall Tr., at p. 61:18-23.

49.     As a result thereof, after the Owner/Harkins Contract had been executed, Harkins engaged in extensive efforts to aggressively, unreasonably and impractically reduce the cost of the HVAC work through the VE process.

50.     The Owner relied upon Harkins and its subcontractors to "come up with suggestion[s]" with respect to the HVAC design, not the design team, to meet the HVAC allowance amount with the intention that Harkin's "suggestion(s)" would be passed on to Moore. *See* Ex. 1, Sudall Tr., at pp. 70:10-71:9.

51.     The Owner looked to "Harkins to provide a viable concept [for the design of the HVAC system] that [it] can pass to the design team." *See id.,* at p. 72:17-24.

52.     Harkins was the "driver or leader of" the VE efforts with respect to the HVAC design. *See id.*, at pp. 93:13-20; 97:8-10.

53.     According to Sudall, the Owner relied on the "builder and subcontractors to come up with a redesign and not . . . the design team" because the builder and subcontractors had "experience in building thousands of units." *See id*., at p. 71:10-16.

54.     Sudall testified that it was his position that it was industry practice to rely on a builder to VE a building's HVAC design. *See id*., at pp. 77:21-78:3.

55.     Sudall testified as follows with respect to why the Owner relied upon Harkins to design an alternative HVAC design and not Design Team:

> Q: Why would you not have asked Minno & Wasko and/or Moore to come up with the reasonable alternative [HVAC design] to meet your [HVAC] allowance? Why would you rely on the contractors instead?
> A: Harkins has the experience of building thousands of units.  They go out and buy these systems many times a year.   And we are relying on their expertise to come up with a reasonable alternative or a reasonable suggestions for a design.
> Q: It is fair to say that the [HVAC] design that was implemented was an alternative recommended and suggested by Harkins, correct?
> A: Yes.  I would say the final—Harkins brought in a subcontractor who

> brought in Samsung.  We all had a meeting with Moore, with Minno &
> Wasko, with Harkins and I think the ultimate subcontractor UGI to discuss
> how the Samsung system would work in these apartments.

*See id.,* at pp. 78:17-79:12.

56.    One of the critical components of the HVAC design that was VE'd by Harkins was the AHUs for each of the Building's 210 apartments.

57.    Samsung, through Harkins and its subcontractor UGI HVAC Enterprises, Inc. ("UGI"), supplied packaged horizontal AHUs for each of the 210 apartments in the Building, because the substituted AHUs were a VE'd product.  *See id.*, pp. 80:8-81:9.

58.    The value engineered AHUs that were installed in each of the apartments were recommended by Harkins, its subcontractor UGI and the manufacturer were a deviation from Moore's initial design, which called for the AHUs to be made by a different manufacturer and orientation.  *See id.*, at p. 108:2-13.

59.    Project documents indicate that Harkins and its subcontractors had extensive communication regarding the re-design of the HVAC system over the course of many months between late 2016 through the Summer/Fall of 2017, including the changing of the initially-specified manufacturer of the AHUs and the size of the AHUs—that were entirely separate and independent of Moore such that Moore was effectively "sidelined."  *See id.*, at pp. 116:15-117:9; 121:7-22.

60.    Sudall testified that "Harkins' subcontractors made recommendations which were passed on to Moore" and acknowledged that it would have been critical for the information provided by Harkins to Moore with respect to Harkins' proposals for the HVAC system's re-design to be true, accurate and complete.  *See id.*, at pp. 110:17-18; 111-5-112:1; 116:4-14.

61.    Construction meeting minutes dated April 27, 2017 reflect a meeting attended only by representatives of Harkins, Nolen, and lenders, wherein those parties: "Discussed HVAC design of the public spaces with engineer.  They noted they disagree with the concept of the equipment sizes being oversized but they need to complete their design and will consider the recommendations. . . The VE sized equipment in the public spaced is how both subcontractors proposed getting to budget."   A true and correct copy of Construction Meeting Minute Number 16 dated April 27, 2017, at Note 20, is attached hereto as Exhibit "6."

62.    Sudall testified that it was "Harkins who was driving the value engineering with respect to the sizing of [HVAC] equipment."  *See* Ex. 1, Sudall Tr., at p. 117:18-21.

63.    Sudall acknowledged that meeting minutes reflect discussions between Harkins and Nolen that if the HVAC equipment sizing was not adjusted then there could be cost implications. *See id.*, at pp. 124:15-124:21.

64.    Although, details regarding the VEing of the HVAC AHUs is not yet known, as Mr. Sudall did not know and/or could not recall details about that issue in the context of his deposition. Hence, factual issues concerning Harkins, its HVAC subcontractor and/or the product manufacturer(s)' roles, knowledge and involvement with respect to the sizing of installed HVAC AHUs will be a central focus of discovery after Harkins is joined in the action.

65.    Another critical VE'd component of the Project was the elimination of ductwork insulation initially called in the Project's design documents.

66.    Included in Moore's design of the Building was a recommendation that certain interior aspects of the HVAC ductwork be insulated to protect against the potential for condensation issues.

67.    In addition, M&W's design of the Building (and proper construction practices) called for installation of roof insulation and construction of the building envelope and adequate sealing of the Building's building envelope penetrations/fenestrations.

68.    During an April 27, 2017 Owner and Architect Progress Meeting, wherein M&W and Moore were notably absent, the minutes state during "discussion on the clear space within the truss spaces . . . , it was made clear Mech[anical] engineer is insulating all ductwork within the truss spaces between the floors. The discussion of this issue resulted in agreement the ductwork would NOT be insulated within the truss spaces. . ." (the "April 27, 2017 Meeting"). *See* Ex. 6, April 27, 2017 Meeting Minute, at Note 20.

69.    On or about May 15, 2017, the Owner, Nolen, Harkin, M&W and Moore discussed VE efforts and the omission of ductwork insulation to reduce construction costs (the "May 2017 Meeting").

70.    Harkins made representations to the Owner and Nolen (as well as M&W and Moore) recommending, suggesting and/or advocating for the omission of ductwork insulation and opining on the feasibility and/or propriety of such an omission before, during and/or after the April 27,. 2017 Meeting and/or May 2017 Meeting.

71.    On June 15, 2017, Moore emailed M&W cautioning against the omission of ductwork insulation, stating:

> Per the VE design meeting on May 15, 2017 attended by [Moore] with Minno/Wasko, the GC and the owner.  [Moore] was directed to omit the supply and return air duct insulation on all ductwork inside the building envelope.  While this insulation isn't required by the current code, it is good practice (particularly in the supply side) as there is a possibility of condensation forming on the cold ductwork which may cause water damage to ceilings and other building materials.  [Moore] will proceed as directed and remove the insulation requirement from the drawings and specifications (for ductwork inside the building) unless directed otherwise.

A true and correct copy of Moore's June 15, 2017 Email to M&W is attached hereto as Exhibit "7."

72.     M&W forwarded Moore's June 15, 2017 Email to Nolen confirming that Owner/Harkins' request to remove ductwork insulation "was made primarily for cost savings."   A true and correct copy of M&W's June 15, 2017 Email to Nolen is attached hereto as Exhibit "8."

73.     Hence, the Owner and/or Nolen were aware of potential ramifications of their VE decision to omit ductwork insulation.  Yet, the Owner and Nolen decided to press-ahead with the omitted design element in order to save money.

74.     Harkins' recommendations and/or representations regarding the feasibility of omitting ductwork and the Owner and/or Nolen's decision to implement Harkins' VE recommendation, are among the reasons why Moore's design was changed to omit duct work insulation.

75.     Sudall testified that Nolen and/or the Owner relied upon Harkins' recommendations and/or representations about the omission of ductwork insulation when Nolen and/or the Owner agreed to allow Harkins to omit ductwork insulation from the as-built construction of the Building. *See* Ex. 1, Sudall Tr., at p. 287:1-12.

76.     In addition to meeting minutes and project documents showing that Harkins and Nolen engaged in significant efforts to VE HVAC design elements, it is evident from preliminary discovery that Harkins and Nolen also made VE decisions with respect to roof insulation and elements of the Project's building envelope or "skin."

77.     Sudall testified that there may have been instances where the contract documents relating to the building envelope were changed through coordination solely between Nolen and Harkins, and without involvement of M&W.  *See id.*, at p. 252:5-22.

78.     Discovery is on-going with respect to VE issues associated with the building envelope and will be amongst the issues probed in further discovery after Harkins' joinder.

79.     Nolen and/or the Owner and/or Nolen relied upon Harkins' recommendations and/or representations about the omission and/or substitution of roof insulation and other components of the Building's envelope and/or "exterior skin" such that Nolen and/or the Owner allowed Harkins to omit initially-design elements from the Building's as-built construction.

**E.      Harkins' Responsibility for, and Liability Associated with, VEing the Project**

80.     M&W contends that the Owner and Nolen assumed the risk of any alleged issues associated with the Project's HVAC system when Owner and/or Nolen, upon the representations, counsel and/or advice of Harkins, chose to VE the HVAC system by eliminating ductwork insulation, roof insulation, HVAC equipment, and VE other components of the building envelope.

81.     Nolen and Harkins made decisions relating to the construction of the Building, including but not limited to, decisions as to what aspects of the design would be approved or value engineered-out of the ultimate design without regard for M&W and Moore's involvement, feedback, input and/or positions.

82.     Harkins failed to cooperate with M&W and went out of its way to bypass, "sideline," minimize and/or restrict M&W's involvement in, and positions with respect to, the VE process for the purposes of "keeping the Plaintiff's ear" and holding sway over the Plaintiff Owner in order to VE the Project as much as possible so that Harkins could benefit from the GMP structure of the Owner/Harkins Contract.

83.     In doing so, against the recommendations of M&W and Moore and construction best practices, Nolen and Harkins VE'd aspects of Moore's HVAC design and M&W's architectural design out of the Project's construction.

84.     M&W maintains that Harkins' decisions on how to construct the Project (and misrepresentations to the Owner/Nolen relating thereto upon which the Plaintiff and Nolen relied) are among the reasons for the Plaintiff's alleged condensation and humidity issues (and damages) with respect to the Project.

85.     As a result of Harkins' VE recommendations/representations and the Owner and/or Nolen's VE decisions (in reliance upon Harkins' representations), M&W's initial design of roof insulation and Moore's design calling for insulation of interior HVAC ductwork and HVAC equipment sizes, as well as potentially other building components, were omitted and/or modified from the Project's ultimate design and construction.

86.     Harkins' representations, directions and/or decisions concerning VEing the Project's design to remove ductwork insulation, select oversized and/or inappropriately-sized HVAC equipment, and omit roof insulation are among the causes of the Building's alleged condensation and/or humidity issues.

### F.    Deficiencies in the Building's Construction

87.     During deposition, Sudall acknowledged an email from Jim Nolen to Sudall stating: "Harkins has cut corners at very single opportunity."  *See id.*, at p. 265:2-18.

88.     Sudall acknowledged that there were numerous punchlists and other documents generated the course of the Project, towards the completion of construction, wherein deficiencies in the construction of the Building's roof, "exterior skin" and building envelope were noted.  *See generally, id.*, at pp. 255-268.

89.     Sudall acknowledged construction deficiencies with respect to Harkins' caulking of windows and balconies, lack of proper roof flashing, roof installation, sealing of the roof, etc.  *See id.*

90.     Moore noted problems with Harkins' installation of flex ductwork being longer than permitted, improper elbows and support of ductwork.  *See id.*, at pp. 261-264 (referencing Ex. 43 to the transcript, November 27, 2019 Email from M&W to Harkins).

91.     Sudall further testified about complaints by the Owner to Harkins about "continued unresolved HVAC issues at the [Building] that UGI [Harkins' HVAC subcontractor] has been either unable or unwilling to resolve…."  *See id.*, at pp. 272-281 (referencing Exhibit 46 to the transcript, July 14, 2020 email and letter from Sudall to Harkins).

92.     M&W maintains that Harkins' improper, inadequate, incomplete and/or deficient construction of the Building are among the causes of the Project's alleged condensation and/or humidity issues.

G.     **Opinions as to the Cause of the Building's Alleged Issues**

93.     Prior to litigation, the parties engaged in a preliminary investigative process to identify the potential reasons why there may be alleged humidity and condensation issues in the Building.

1.     **Moore's Analysis**

94.     Moore prepared an analysis dated November 12, 2021, wherein Moore rejected the Owner's claim that Moore's HVAC design deficiencies were the reason for the Building's condensation issues ("Moore Analysis").  A true and correct copy of Moore's November 12, 2021 Analysis is attached hereto as Exhibit "9."

95.     Moore's Analysis stated that: "[Moore] was not involved in the VE effort and did not provide any direction for elimination for insulation.  The lack of duct insulation is the major cause of the condensation and moisture issues throughout the apartment units."  *See id.*, at p. 2.

96.     Moore also identified potential issues with the Building's "envelope" and "vapor barrier" and inadequate sealing of penetrations throughout the Building envelope as a cause for the Building's condensation issues.   *See id.*, at p. 1.

97.     Moore further noted: "As you may recall, throughout the construction of this building, there were numerous site walkthroughs where poor installation and construction were identified.   To our knowledge, these issues have not been addressed or corrected."  *See id.*, at p. 4.

98.     Other than engaging Building Science Corporation ("BSC") to prepare the report explained below, the Owner has not taken any efforts to evaluate aspects of the building envelope in the context of Moore's Analysis.   *See* Ex. 1, Sudall Tr., at pp. 287:23-289:1.

99.     The Plaintiff alleges that it has suffered damages as a result of the exact type of condensation issues that Moore's initial design was intended to prevent by the incorporation of interior duct insulation in unconditioned spaces.

100.    As opined by Moore, M&W maintains that deficiencies in the Building's construction that are the direct and proximate result of Harkins' improper, deficient and/or incomplete construction of the Project, which remain unresolved and unaddressed by the Owner, are among the causes of the Project's alleged condensation and humidity issues.

## 2.    Building Science Corporation Report

101.    Existing and/or alleged deficiencies in the construction of the Building's air barrier, vapor barrier and/or sealing of penetrations in/through the building envelope are the direct and proximate result of Harkins' deficient and/or improper construction of the Building and/or failures to construct the Project consistent with the design drawings of Moore and/or M&W.

102.    Alleged issues with humidity and/or condensation within the Building were/are directly and proximately caused by Harkins' deficient, inadequate and improper workmanship of

the Building and/or deviation from the design documents with respect to, the Building's envelope and/or HVAC components.

103.    This position is supported by a November 18, 2021 investigative report prepared by a third-party BSC, on behalf of the Owner/Nolen, which evaluated the cause of alleged humidity, condensation and mold growth issues in the Building (the "BSC Report").  A true and correct copy of the BSC Report is attached hereto as Exhibit "10."

104.    BSC's analysis identified numerous construction-related deficiencies amongst the reasons for the Building's humidity/condensation issues.

105.    BSC noted instances where there is air leakage at or around various areas of the Building: (i) around electrical conduit penetrations through the roof (BSC Report at p. 11-12); (ii) beyond the interior gypsum board (id., at p. 14); (iii) exterior wall hard ceiling joint (id., at p. 15); (iv) floor truss penetrations of the outside wall (id., at p. 16); (v) potentially behind interior finishes (id.); (vi)  at or around the roof parapet of the exterior wall (id., at p. 17); and (vi) various other locations around the Building (id., at pp. 18-25).

106.    Sudall acknowledged that the BSC report "found instances where there was infiltration of air through the vapor barrier.  But I don't know what—I cannot confirm whether it was sealed or not sealed."  *See* Ex. 1, Sudall Tr., at p. 296:1-10.

107.    BSC stated that it agreed with Moore's position that "air barrier imperfections (not vapor barrier imperfections) are a source of hot humid air leakage into the ceiling cavity in summer."  *See* Ex. 10, BSC Report, at p. 31.

108.    Sudall acknowledged that while some issues relating to air leakage identified in the BSC Report have been corrected, most have not been corrected.  *See* Ex. 1, Sudall Tr., at p. 298:4-7.

109.     Other than the BSC Report, the Owner has not "performed an investigation or analysis as to any construction deficiencies that may or may not be causing the moisture and condensation problems on the [P]roject."  *See id.*, at pp. 298:21-299:3.

110.     The BSC Report, in acknowledgment of the lack of duct insulation in unconditioned spaces, stated that one of the recommended "retrofit measures" was the potential use of closed cell spray foam insulation on the ductwork.  *See* Ex. 10, BSC Report, at p. 41.

*111.*     The BSC Report, in acknowledgment of issues with air leakage "in all of the tested residential units above-ceiling spaces," stated that one of the recommended "retrofit measures" was the "[a]ir sealing of the outside penetrations" to "reduce air leakage into the ceiling spaces."  *See id.*

112.     The BSC Report also opined that AHUs for the 1 and 2 bedroom units were oversized and the "oversizing of cooling equipment results in reduced moisture removal or dehumidification."  *See id.*, at pp. 29-30, 37-40.

113.     The BSC Report opined that the "causes of the summertime condensation, mold growth and high interior humidity problems include the following" included the following two conditions that are directly attributable to Harkins' poor construction of the Project and/or involvement in the VE Process and specification of the installed Samsung AHUs:

- "Above-ceiling air space leakage;" and
- "HVAC operation and Dehumidification" of the installed Samsung AHUs.

*See id.*, at p. 41.

114.     To the extent that BSC's analysis is shown to be correct, although M&W does not admit and/or concede the same, then deficiencies in the Building's construction are the direct and proximate result of Harkins' improper, deficient and/or incomplete construction of the Project.

25

Hence, Harkins is responsible, in or whole or in part, for the Project's alleged condensation and humidity issues.

115.    To the extent that BSC's analysis is shown to be correct, although M&W does not admit and/or concede the same, then inadequacies and/or deficiencies with respect to the oversizing and/or functionality of AHUs are the direct and proximate result of Harkins' recommending, selecting, specifying and substituting the HVAC equipment by way of the VE process.  Hence, Harkins is responsible, in or whole or in part, for the Project's alleged condensation and humidity issues.

### 3.    Building Superintendent's Position on the Cause of Condensation Issues

116.    In an email dated July 14, 2020 from the Building's superintendent to Sudall, the superintendent stated that he believed that condensation issues in the Building may be because of "poor insulation in unconditioned areas where the duct runs."   A true and correct copy of the July 4, 2020 Email and Letter are attached hereto as Exhibit "11."

117.    Sudall disagreed with the superintendent's position.  *See* Ex. 1, Sudall Tr., at pp. 272:19-282:8.

118.    Sudall acknowledged that the Building's superintendent had, in a few instances, taken it upon himself to spray foam insulation on ductwork in unconditioned areas in an effort to correct the deficiencies noted by the superintendent. *See id.*, at pp: 293:2-294:11.

119.    Upon information and belief, the Owner has not undertaken efforts to insulate all remaining ductwork in unconditioned spaces throughout the Building.

120.    Consistent with the Project Superintendent's position, the lack of insulation on ductwork in unconditioned spaces (which is the result of the Owner, Nolen and Harkins' VE decisions) is among the causes of the Project's alleged condensation and humidity issues.

121.    For these reasons, there exist numerous factual bases to join Harkins in this Action, even at this early stage of the litigation and prior to the exchange of all discovery and start of fact witnesses' depositions.

122.    All conditions precedent to initiating litigation against Harkins have been satisfied and/or waived.

**COUNT I**
**CONTRIBUTION**

123.    M&W repeats and reiterates by reference its averments in the foregoing paragraphs in its Third-party Complaint as if they were set forth fully herein at length.

124.    Harkins owed M&W a duty, distinct from the Owner/Harkins Contract, to not misrepresent, negligently convey and/or inaccurately convey factual information to the Plaintiff, Nolen and M&W pertinent to the Project's design and construction.

125.    Harkins owed M&W a duty, distinct from the Owner/Harkins Contract, to construct the Project consistent with M&W and Moore's design drawings, recommendations and direction.

126.    Harkins owed M&W a duty, distinct from the Owner/Harkins Contract, to not interfere with, obstruct and/or negatively disrupt M&W's design and administration of the Project and to not encourage the Plaintiff and/or Nolen to disregard, ignore, and/or bypass M&W.

127.    Harkins owed M&W a duty, distinct from the Owner/Harkins Contract, to construct the Project in a good and workmanlike manner in compliance with industry standards and practices, applicable laws, regulations, codes and rules.

128.    Harkins violated its duty owed to M&W by: (i) misrepresenting, negligently conveying and/or inaccurately conveying factual information with respect to the value engineering of the HVAC system; (ii) failing to cooperate with M&W; (iii) intentionally bypassing M&W in the design process; (iv) ignoring, disregarding and/or overruling M&W and/or Moore with respect

to the design and ultimate construction of the Project; (v) encouraging the Plaintiff to ignore, disregard and/or overrule M&W and/or Moore's positions with respect to the value engineering of the Project; and (vi) failing to construct the Project in a workmanlike manner without defects and/or deficiencies.

129.    M&W and Harkins owed the Plaintiff similar duties (outside of contractual obligations) to design/construct a safe and non-defective Building.

130.    Plaintiff's allegations against M&W and damages claimed in the Complaint relate to a single injury arising from defects in the Building, which is potentially indivisible between Harkins and M&W.

131.    If the Plaintiff is entitled to recovery against M&W for sustained defects and damages as alleged in the Complaint, said defects and damages hereby being expressly denied, then said defects and damages are proximately and directly caused by Harkins' negligent acts and/or omissions and/or breaches of duties and were in no way due to the acts and/or omissions or liability of M&W.

132.    The Plaintiff's damages, if any, were caused solely and/or in part by the conduct of Harkins and Harkins is entirely and/or primarily liable for Plaintiff's alleged damages, if any.

133.    In the event Plaintiff is entitled to a recovery against M&W, which is specifically denied, then Third-Party Defendant Harkins Builders, Inc. is liable to M&W for contribution, or otherwise for the full amount of any sums which may be adjudged against M&W.

**WHEREFORE**, Minno & Wasko Architects and Planners, PC respectfully requests that this Honorable Court enter judgment in its favor and against the Third-party Defendant Harkins Builders, Inc. jointly and severally, in an amount in excess of $75,000, together with interest, costs, and with such further relief as the Court deems just and proper.

## COUNT II
## COMMON LAW INDEMNIFICATION

134.    M&W repeats and reiterates by reference its averments in the foregoing paragraphs in its Third-Party Complaint as if they were set forth fully herein at length.

135.    A legal and/or special relationship existed between M&W and Harkins, including but not limited to, the special relationship set forth in Article 3 of the Owner/Harkins Contract.

136.    Harkins violated and/or breached its special relationship with M&W by: (i) misrepresenting, negligently conveying and/or inaccurately conveying factual information with respect to the value engineering of the HVAC system and/or Project's building envelope/vapor barrier; (ii) failing to cooperate with M&W; (iii) intentionally bypassing M&W in the design process; (iv) ignoring, disregarding and/or overruling M&W and/or Moore with respect to the design and ultimate construction of the Project; (v) encouraging the Plaintiff to ignore, disregard and/or overrule M&W and/or Moore's positions with respect to the value engineering of the Project; and (vi) failing to construct the Project in a workmanlike manner without defects and/or deficiencies.

137.    As the Project Architect, M&W reasonably and justifiably expected that Harkins would maintain and not breach and/or violate the parties' special relationship.

138.    Plaintiff's allegations against M&W and damages claimed in the Complaint relate to a single injury arising from defects in the Building, which is potentially indivisible between Harkins and M&W.

139.    If the Plaintiff is entitled to a recovery against M&W for sustained defects and damages as alleged in the Complaint, said defects and damages hereby being expressly denied, then said defects and damages are proximately and directly caused by Harkins' negligent acts

and/or omissions and/or breaches of duties and were in no way due to the negligent acts and/or omissions or liability of M&W.

140. The Plaintiff's damages, if any, were caused solely and/or in part by the conduct of Harkins and Harkins is entirely and/or primarily liable for Plaintiff's alleged damages, if any.

141. In the event Plaintiff is entitled to a recovery against M&W, which is specifically denied, then third-party defendants are solely, jointly, and or severally liable to the Plaintiff in this action.

142. In the event Plaintiff is entitled to a recovery against M&W, which is specifically denied, then the Third-party Defendant Harkins is liable to M&W for common law indemnification, or otherwise for the full amount of any sums which may be adjudged against M&W.

**WHEREFORE**, Minno & Wasko Architects and Planners, PC respectfully requests that this Honorable Court enter judgment in its favor and against the Third-party Defendant Harkins Builders, Inc. jointly and severally, in an amount in excess of $75,000, together with interest, costs, and with such further relief as the Court deems just and proper.

## COUNT III
## CONTRACTUAL INDEMNIFICATION

143. M&W repeats and reiterates by reference its averments in the foregoing paragraphs in its Third-Party Complaint as if they were set forth fully herein at length.

144. A legal and/or special relationship existed between M&W and Harkins, including but not limited to, the special relationship set forth in Article 3 of the Owner/Harkins Contract.

145. Exhibit "A" to the Owner/Harkins Contract, AIA Document A201-2007, General Conditions of the Contract for Construction, as amended, defines "Indemnitees," subject to the indemnification provision in the General Conditions (the "Indemnification Provision"), as:

> the Owner, Owner's general partner, Lender, Architect and each of their respective members, partners, officers, directors, employees and agents, and each of their respective heirs, successors, and assignees.

*See* Ex. 2, Owner/Harkins Contract, Ex. A, General Conditions, at ¶1.1.11.

146.    The Indemnification Provision, at Section 3.18 of the Owner/Harkins Contract General Conditions, provides that Harkins agrees to indemnify and hold harmless the Indemnitees (which included M&W and Moore) from, among other claims: "(2) injury to or destruction of tangible property (other than the Work itself) to the extent caused by the negligent acts or omissions of Contractor, Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable." *See* Ex. 2, Owner/Harkins Contract, Ex. A, General Conditions, at ¶3.18.

147.    Plaintiff alleges in the Complaint that it sustained injury and/or damages to tangible property other than the Work itself. *See* paragraphs 16-19, above.

148.    Harkins' contractual duty to indemnify and hold harmless M&W included, but are not limited to, claims arising out of Harkins' (and/or its subcontractors) alleged negligent acts or omissions or any breach of contractual obligations owed pursuant to the Owner/Harkins Contract regarding workmanship.

149.    The Plaintiff's damages in this action arise directly from and/or relate directly to Harkins' performance of its scope of work pursuant to the Owner/Harkins Contract.

150.    Although M&W expressly denies the truth of the allegations set forth in the Complaint, Harkins is obligated to indemnify and hold harmless M&W (as the project architect) pursuant to the Owner/Harkins contract.

151.    Harkins' breach of the Owner/Harkins Contract by virtue of its defective construction of the Project and other acts and/or omissions set forth herein, and its failure to

indemnify and hold harmless M&W, have resulted and continue to result in damages to M&W, including, but not limited to, defense costs, fees and exposure to potential judgment.

**WHEREFORE**, Minno & Wasko Architects and Planners, PC respectfully requests that this Honorable Court enter judgment in its favor and against the Third-party Defendant Harkins Builders, Inc. jointly and severally, in an amount in excess of $75,000, together with interest, costs, and with such further relief as the Court deems just and proper.

## COUNT IV
## NEGLIGENCE

152.    M&W repeats and reiterates by reference its averments in the foregoing paragraphs in its Third-Party Complaint as if they were set forth fully herein at length.

153.    A legal and/or special relationship existed between M&W and Harkins, including but not limited to, the special relationship set forth in Article 3 of the Owner/Harkins Contract.

154.    Harkins owed M&W, as the Project Architect and a member of the "team" that constructed the Project, duties independent of, and distinct from the Owner/Harkins Contract.

155.    Harkins owed M&W duties to: (i) accurately and completely provide, convey and/or represent factual information with respect to the value engineering of the HVAC system and/or Project's building envelope/vapor barrier; (ii) cooperate with M&W; (iii) include M&W in the design process; (iv) follow and comply with M&W and/or Moore's design documents, instructions and/or recommendation with respect to the construction of the Project; (v) not interfere with M&W's contract with the Owner and/or interfere, disrupt and/or negatively impact M&W's design and administration of the Project and (vi) construct the Project in a workmanlike manner without defects and/or deficiencies.

156.    As the Project Architect, M&W reasonably and justifiably relied upon the reasonable expectation and understanding that Harkins would maintain and not breach and/or violate the parties' special relationship.

157.    As the Project Architect, M&W reasonably and justifiably relied upon the reasonable expectation and understanding that Harkins would accurately and completely conveying information pertinent to the Project's design and construction to M&W (and Moore through M&W).

158.    As the Project Architect, M&W reasonably and justifiably relied upon the reasonable expectation and understanding that Harkins would act in accordance with its special relationship with M&W, consistent with Article 3 of the Owner/Harkins Contract, and cooperate with M&W.

159.    As the Project Architect, M&W reasonably and justifiably expected and relied upon the expectation and understanding that Harkins would not ignore, disregard, and/or refuse to comply with M&W's design documents, recommendations, and/or instructions.

160.    As the Project Architect, M&W reasonably and justifiably expected and relied upon the expectation and understanding that Harkins would not encourage, permit, and/or facilitate the Owner and/or Nolen to ignore, disregard, and/or refuse to comply with M&W's (and/or Moore's) design documents, recommendations, and/or instructions.

161.    As the Project Architect, M&W reasonably and justifiably expected and relied upon the expectation and understanding that Harkins would construct the Project in a workmanlike manner, free from defects, consistent with the Owner/Harkins Contract, consistent with regulations, codes, and/or rules, and consistent with building standards and practiced.

162.    Harkins violated and/or breached duties owed to M&W by: (i) misrepresenting, negligently conveying and/or inaccurately conveying factual information with respect to the value engineering of the HVAC system and/or Project's building envelope/vapor barrier; (ii) failing to cooperate with M&W; (iii) intentionally bypassing M&W in the design process; (iv) ignoring, disregarding and/or overruling M&W and/or Moore with respect to the design and ultimate construction of the Project; (v) encouraging the Plaintiff to ignore, disregard and/or overrule M&W and/or Moore's positions with respect to the value engineering of the Project; and (vi) negligently constructing the Project in a workmanlike manner without defects and/or deficiencies.

163.    Plaintiff's allegations against M&W and damages claimed in the Complaint relate to a single injury arising from defects in the Building, which is potentially indivisible between Harkins and M&W.

164.    If the Plaintiff is entitled to a recovery against M&W for sustained defects and damages as alleged in the Complaint, said defects and damages hereby being expressly denied, then said defects and damages are proximately and directly caused by Harkins' negligent acts, negligent misrepresentations, negligent omissions, breaches of duties, and/or breaches of the Owner/Harkins Contract and were in no way due to the negligent acts and/or omissions or liability of M&W.

165.    The Plaintiff's damages, if any, were caused solely and/or in part by the conduct of Harkins and Harkins is entirely and/or primarily liable for Plaintiff's alleged damages, if any, as a result of Harkins negligent acts and/or omissions as set forth above.

**WHEREFORE**, Minno & Wasko Architects and Planners, PC respectfully requests that this Honorable Court enter judgment in its favor and against the Third-party Defendant Harkins Builders, Inc. jointly and severally, in an amount in excess of $75,000, together with interest,

costs, and with such further relief as the Court deems just and proper.

### COUNT V
### NEGLIGENT MISRPRESENTATION

166.    M&W repeats and reiterates by reference its averments in the foregoing paragraphs in its Third-Party Complaint as if they were set forth fully herein at length.

167.    A legal and/or special relationship existed between M&W and Harkins, including but not limited to, the special relationship set forth in Article 3 of the Owner/Harkins Contract.

168.    Harkins owed M&W, as the Project Architect, a duty to accurately and completely provide, convey and/or represent factual information with respect to the value engineering of the HVAC system and/or Project's building envelope/vapor barrier.

169.    As the Project Architect, M&W reasonably and justifiably relied upon the reasonable expectation that Harkins would maintain and not breach and/or violate the parties' special relationship.

170.    As the Project Architect, M&W reasonably and justifiably relied upon Harkins accurately and completely conveying information pertinent to the Project's design and construction to M&W (and Moore through M&W).

171.    Sudall, as the Owner's project manager, testified that "Harkins' subcontractors made recommendations which were passed on to Moore" and acknowledged that it would have been critical for the information provided by Harkins to Moore with respect to Harkins' proposals for the HVAC system's re-design to be true, accurate and complete.  *See* Ex. 1, Sudall Tr., at pp. 110:17-18; 111-5-112:1; 116:4-14.

172.    Upon information and belief, the representations of Harkins, and/or its subcontractor UGI, with respect to the VE design of the HVAC system (including the AHUs' sizing, product selection, and/or product specifications) were inaccurate, incomplete and/or improper.  M&W's

35

position in this regard is subject to on-going discovery and future expert evaluation, analysis and/or testing.

173.    Harkins, and its subcontractors, made numerous representations to M&W, Moore, Nolen, the Owner and/or third-party inspectors that work identified in punchlists and/or deficiencies notices, was corrected properly and completed.

174.    M&W reasonably and justifiably relied upon Harkins and/or its subcontractors' representations as to the complete, proper and thorough completion of all punchlist and/or remedial work with respect to the Project's HVAC system, envelope, "skin," vapor barrier, sealing of fenestrations/penetrations, and/or roof system.

175.    Upon information and belief, the representations of Harkins, its subcontractors were inaccurate, incomplete and/or improper.  M&W's position in this regard is subject to on-going discovery and future expert evaluation, analysis and/or testing.

176.    The Plaintiff's damages, if any, were caused solely and/or in part by the conduct of Harkins and Harkins is entirely and/or primarily liable for Plaintiff's alleged damages, if any, as a result of Harkins' and/or its subcontractors' negligent misrepresentations.

**WHEREFORE**, Minno & Wasko Architects and Planners, PC respectfully requests that this Honorable Court enter judgment in its favor and against the Third-party Defendant Harkins Builders, Inc. jointly and severally, in an amount in excess of $75,000, together with interest, costs, and with such further relief as the Court deems just and proper.

## COUNT VI
## <u>BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING</u>

177.    M&W repeats and reiterates by reference its averments in the foregoing paragraphs in its Third-Party Complaint as if they were set forth fully herein at length.

178.    A legal and/or special relationship existed between M&W and Harkins, including but not limited to, the special relationship set forth in Article 3 of the Owner/Harkins Contract.

179.    Harkins owed M&W, as the Project Architect and member of the construction and design team, a duty of good faith and fair dealing.

180.    As the Project Architect, M&W reasonably and justifiably relied upon the reasonable expectation that Harkins would maintain and not breach and/or violate its obligation to act fairly and in good faith with respect to the construction of the Project.

181.    Harkins violated and/or breached its duty of good faith and failing dealing owed to M&W by: (i) misrepresenting, negligently conveying and/or inaccurately conveying factual information with respect to the value engineering of the HVAC system and/or Project's building envelope/vapor barrier; (ii) failing to cooperate with M&W; (iii) intentionally bypassing M&W in the design process; (iv) ignoring, disregarding and/or overruling M&W and/or Moore with respect to the design and ultimate construction of the Project; (v) encouraging the Plaintiff to ignore, disregard and/or overrule M&W and/or Moore's positions with respect to the value engineering of the Project; and (vi) negligently constructing the Project in a workmanlike manner without defects and/or deficiencies.

182.    Upon information and belief, Harkins failed to act fairly and in good faith vis-à-vis M&W so that Harkins could unilaterally and independently VE the Project as much as possible, without M&W "getting in the way," in order to increase Harkins' pecuniary benefit in light of the GMP structure of the Owner/Harkins Contract.

183.    Plaintiff's allegations against M&W and damages claimed in the Complaint relate to a single injury arising from defects in the Building, which is potentially indivisible between Harkins and M&W.

184.    If the Plaintiff is entitled to a recovery against M&W for sustained defects and damages as alleged in the Complaint, said defects and damages hereby being expressly denied, then said defects and damages are proximately and directly caused by Harkins' bad faith and unfair dealing with respect to the Project.

185.    The Plaintiff's damages, if any, were caused solely and/or in part by the conduct of Harkins and Harkins is entirely and/or primarily liable for Plaintiff's alleged damages, if any, as a result of Harkins negligent acts and/or omissions as set forth above.

**WHEREFORE**, Minno & Wasko Architects and Planners, PC respectfully requests that this Honorable Court enter judgment in its favor and against the Third-party Defendant Harkins Builders, Inc. jointly and severally, in an amount in excess of $75,000, together with interest, costs, and with such further relief as the Court deems just and proper.

## COUNT VII
## BREACH OF CONTRACT

189.    M&W repeats and reiterates by reference its averments in the foregoing paragraphs in its Third-Party Complaint as if they were set forth fully herein at length.

190.    A legal and/or special relationship existed between M&W and Harkins, including but not limited to, the special relationship set forth in Article 3 of the Owner/Harkins Contract.

191.    The Owner/Harkins Contract defines the "Relationship of the Parties" as follows:

> [Harkins] accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner *to cooperate with the Architect* and exercise the Contractor's skill and judgment in furthering the interests of the Owner, to furnish efficient business administration and supervision, to furnish at all times an adequate supply of workers and materials, and to perform the Work in an expeditious and economical manner consistent with the Owner's interests.

*See* Ex. 2, Owner/Harkins Contract, at Article 3 (emphasis added).

192.    Harkins failed to cooperate with M&W during the course of the Project, for the reasons set forth above.

193.    Harkins breached the Owner/Harkins Contract by failing to cooperate with M&W throughout the course of the Project's construction.

194.    Harkins' breach of the Owner/Harkins Contract has resulted, and continue to result, in damages to M&W.

**WHEREFORE**, Minno & Wasko Architects and Planners, PC respectfully requests that this Honorable Court enter judgment in its favor and against the Third-party Defendant Harkins Builders, Inc. jointly and severally, in an amount in excess of $75,000, together with interest, costs, and with such further relief as the Court deems just and proper.

Respectfully submitted,

THOMPSON BECKER L.L.C.
*Attorneys for Defendant,*
*Minno & Wasko Architects and*
*Planners, P.C.*

By:    /s/ Kathleen J. Seligman

Dated: July 16, 2024

John M. Becker, Esq.
Joseph T. Ciampoli, Esq.
Kathleen J. Seligman, Esq.

39